Filed 7/31/13

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>    Petitioner,<br><br>    v.<br><br>THE SUPERIOR COURT OF<br>LOS ANGELES COUNTY,<br><br>    Respondent;<br><br>SEAN CARDILLO et al.,<br><br>    Real Parties in Interest. | No. B246745<br><br>(Los Angeles County<br> Super. Ct. No. BA389476) |

ORIGINAL proceedings in mandate. Bob S. Bowers, Judge. Writ granted.

Jackie Lacey, District Attorney, Phyllis Asayama, Roberta Schwartz and Cassandra Hart, Deputy District Attorneys, for Petitioner.

No appearance for Respondent.

Joseph F. Walsh for Real Party in Interest Sean Cardillo.

No appearance for Real Party in Interest Andrew Cettei.

The question before us in this writ proceeding is whether a person who does not have a medical license or certificate may be criminally charged with practicing medicine without a license in violation of Business and Professions Code section 2052[1] for owning a corporation that operates a medical marijuana clinic in which licensed physicians examine the patients and issue medical marijuana recommendations to patients. We conclude that the owner of the corporation may be so charged, and order the respondent trial court to vacate its order dismissing the practicing medicine without a license charge alleged against real parties in interest Sean Cardillo and Andrew Cettei.

## BACKGROUND

A preliminary hearing was conducted on a 13-count felony complaint filed by the Los Angeles County District Attorney against Cardillo and Cettei. Because this writ proceeding raises an issue of law as to one of those counts -- for practicing medicine without a license in violation of section 2052 -- our discussion of the evidence presented at the preliminary hearing will be limited to the evidence relevant to that count. That evidence included the following.

In January 2010, Medical Board Investigator Thomas Morris began an investigation of Kush Dr., a medical marijuana clinic operating at two locations in Venice, California -- 1313 Ocean Front Walk (the 1313 location), and 1811 Ocean Front Walk (the 1811 location) -- after receiving a formal written complaint that those locations were operating as an illegal medical marijuana clinic. In records Morris received from the California Secretary of State, Cardillo is listed as agent

---

[1] Further undesignated statutory references are to the Business and Professions Code.

2

for service for Kush Dr., LLC.[2]  Other records Morris obtained from the Secretary of State show that Cardillo is chief executive officer of two other businesses at the 1811 location:  Canna Merchant and Herbalology.  Herbalology was a medical marijuana dispensary located on the second floor of that location, and Canna Merchant was a smoking lounge also located on the second floor.

Morris went to both the 1313 and the 1811 locations and met with the physicians who were seeing patients and issuing medical marijuana recommendations.  The physician at the 1313 location, Dr. Karns, told Morris that he was hired by "Andrew" (i.e., Cettei), that his hours were set by Cettei, and that he received one-third of the money collected from patients at that location.  The physician at the 1811 location, Dr. Hanson, told Morris that he was hired by Cettei, that Cettei was in control of the practice, and that he was paid by Cettei from the proceeds of the recommendations he wrote, although he was not sure of his rate of pay.[3]

In addition to speaking with the physicians, Morris entered the examination room at each location.  Both rooms were small, similar to a closet.  Neither room had an examination table or other equipment required to conduct a proper medical examination, other than a blood pressure cuff and a stethoscope.  Only the room at the 1811 location had running water.

---

[2]  Although Morris initially obtained documents indicating that Cardillo was the sole owner of Kush Dr., he ultimately received information that Cardillo and Cettei each owned 50 percent of the company.

[3]  Morris subsequently spoke with a third doctor, Dr. Serebrin, at one of the locations during the execution of a search warrant.  Dr. Serebrin told him that he was hired by Cettei, and that he was paid one-third of the daily profits.  It is not clear from the record whether the profits Dr. Serebrin referred to included the profits from the sales of marijuana or was limited to the amount the patients paid for the medical marijuana recommendations.  The lack of clarity, however, does not affect our analysis of the issue here.

While he was at the 1811 location, Morris also spoke to Cettei. When Morris told him that licensed physicians must be in charge of medical clinics, Cettei responded that he had a contract showing that Dr. Karns was in charge of the 1313 location. Cettei gave Morris a copy of a lease agreement showing that Kush Dr. was the lessor of the premises at the 1313 location and Dr. Karns was the lessee; Cettei signed the agreement on behalf of Kush Dr. The agreement provided that Dr. Karns, as lessee, would use and occupy the premises to see patients as scheduled by the lessor, that the money collected from the patients would be divided between the lessor and the lessee (with the lessee receiving one-third of the daily profits), and that the lessor would be an agent for the collection of the patient fees.[4]

As part of the investigation of Kush Dr., three undercover agents went to the clinics to get medical marijuana recommendations. They observed people standing in front of each clinic, holding signs and telling passersby that they could "get legal," i.e., become a legal medical marijuana user. Although none of the agents actually had any physical ailment, each of them entered the clinic and told the physician he or she had certain symptoms; one said he got headaches from overdrinking, another said he had insomnia, and the third said she could not relax. In each instance, the agent was given a minimal medical examination by the physician, who then provided the agent with a medical marijuana

---

[4]    The lease agreement, which was introduced into evidence by counsel for Cardillo, was not included in the exhibits filed in support of the writ petition; our description of its contents is based upon Morris' testimony. We note that when Cardillo's counsel questioned Morris about the terms of the agreement, he generally referred to Cettei, or Cettei and Kush Dr., as the lessor.

recommendation.[5]  When one of the agents disputed the amount he was charged for the recommendation, the dispute was settled by Cettei.  The two agents who went to the 1811 location were told by the physicians who saw them that they could purchase medical marijuana upstairs.

Following the presentation of evidence, Cardillo and Cettei moved to dismiss the charge of practicing medicine without a license, on the ground that neither Cardillo nor Cettei treated any patients and instead merely provided management services.  The magistrate, finding that section 2052 applies only to persons who actively treat patients, granted the motion to dismiss that charge.

The District Attorney subsequently filed an information that included a count for practicing medicine without a license in violation of section 2052 (count 14).  Cardillo and Cettei moved under Penal Code section 995 to dismiss, among other counts, count 14.  The court granted the motion as to that count, agreeing with magistrate's interpretation of section 2052.  The District Attorney filed a petition for writ of mandate challenging the trial court's ruling, and we issued an alternative writ of mandate directing the trial court to either vacate its order granting the motion and enter a new order denying the motion or show cause why a peremptory writ of mandate should not issue.

## DISCUSSION

Section 2052 provides in relevant part:  "Notwithstanding Section 146, any person who practices or attempts to practice, or who advertises or holds himself or herself out as practicing, any system or mode of treating the sick or afflicted in this state, or who diagnoses, treats, operates for, or prescribes for any ailment, blemish,

---

[5]  One of the agents was examined at the 1313 location, by a physician other than Dr. Karns.  One of the two agents who were examined at the 1811 location met with a physician other than Dr. Hanson.

5

deformity, disease, disfigurement, disorder, injury, or other physical or mental condition of any person, without having at the time of so doing a valid, unrevoked, or unsuspended certificate as provided in this chapter or without being authorized to perform the act pursuant to a certificate obtained in accordance with some other provision of law is guilty of a public offense, punishable by a fine not exceeding ten thousand dollars ($10,000), by imprisonment in the state prison, by imprisonment in a county jail not exceeding one year, or by both the fine and either imprisonment."[6]  (§ 2052, subd. (a).)

In opposing defendants' motion to dismiss the section 2052 count before the preliminary hearing magistrate, the prosecutor relied upon the "operates for" language of the statute, arguing that it prohibits "any layperson from operating a facility."  The magistrate rejected that interpretation, observing that the statute "doesn't say 'operate a facility.'  It's operating for a cure.  That's what it refers to."

In its writ petition, the District Attorney for the most part ignores the language of the statute, and focuses instead upon case law involving disciplinary proceedings against a licensed dentist for aiding and abetting the unlicensed practice of dentistry by a corporation (*Painless Parker v. Board of Dental Exam.* (1932) 216 Cal. 285 (*Painless Parker*) and against a physician for aiding and abetting the unlicensed practice of medicine by co-owners of the clinic at which the physician worked, who performed administrative work for the clinic (*Steinsmith v. Medical Board* (2000) 85 Cal.App.4th 458 (*Steinsmith*)).  In each

---

**6**     The punishment portion of section 2052 was amended between the time the investigation of the events at issue took place and the preliminary hearing.  Before the amendment, which was made as part of the recent criminal justice realignment in 2011 (Stats. 2011, ch. 15 (A.B. 109), § 11), the punishment portion stated:  "'punishable by a fine not exceeding ten thousand dollars ($10,000), by imprisonment in the state prison, by imprisonment in a county jail not exceeding one year, or by both the fine and either imprisonment.'"  (See *Hageseth v. Superior Court* (2007) 150 Cal.App.4th 1399, 1404.) The amendment does not affect our analysis of the statute here.

case, the court found that a person who merely owns a clinic or facility and administers its business affairs is practicing medicine (or dentistry) and therefore must be licensed. As stated by the Supreme Court in *Painless Parker,* "we are not prepared to hold with the contention that a corporation or an unlicensed person may not be prevented from managing, conducting or controlling what petitioner terms the 'business side' of the practice of dentistry. The law does not assume to divide the practice of dentistry into such departments. Either one may extend into the domain of the other in respects that would make such a division impractical if not impossible. The subject is treated as a whole." (*Painless Parker*, *supra*, 216 Cal. at p. 296.) The court explained the justification for not allowing this division: "If [the licensed professional] owed their first allegiance to their employer, the corporation, . . . then they owed but a secondary and divided loyalty to the patient. This was denounced as not within the intendments of the law and practice." (*Id.* at p. 297.) The court in *Steinsmith* held that the Supreme Court's reasoning applied equally to medical practice. (*Steinsmith*, *supra*, 85 Cal.App.4th at p. 466.)

In his return to the alternative writ of mandate, Cardillo argues that the District Attorney's reliance on *Painless Parker* and *Steinsmith* is misplaced because those are disciplinary, rather than criminal, cases. He contends that under *Keeler v. Superior Court* (1970) 2 Cal.3d 619, he may not be criminally prosecuted for practicing medicine without a license because section 2052 "does not give fair warning that it applies to non-professionals who operate a medical clinic and hire doctors to treat patients at the clinic."

In reply to Cabrillo's return, the District Attorney argues that section 2052 provides fair warning because it unambiguously makes it illegal for an unlicensed person to "practice[] . . . any system or mode of treating the sick or afflicted" (§ 2052), which would include "the operation of medical clinics to treat sick people by exclusively prescribing marijuana and selling it to them." We agree.

7

As the District Attorney notes, the evidence presented at the preliminary hearing indicates that Cardillo and Cettei, as co-owners of Kush Dr., operated clinics solely for the purpose of providing medical marijuana recommendations. As co-owners of Kush Dr., they controlled the operations of the clinics by employing licensed physicians to issue recommendations for medical marijuana, setting the physicians' hours, soliciting and scheduling patients, collecting fees from the patients, and paying the physicians a percentage of those fees. In short, defendants set up a system or mode for treating the sick or afflicted in violation of section 2052. The fact that neither Cardillo nor Cettei actually examined any patients or prescribed medical marijuana to them does not absolve them of criminal liability for practicing medicine without a license. Section 2052 clearly prohibits an unlicensed person from *either* "practicing . . . any system or mode of treating the sick or afflicted" *or* diagnosing, treating, or prescribing for any disease or ailment. Therefore, we conclude the trial court erred by dismissing the practicing medicine without a license count. (*Rideout v. Superior Court* (1967) 67 Cal.2d 471, 474 ["An information will not be set aside or a prosecution thereon prohibited if there is some rational ground for assuming the possibility that an offense has been committed and the accused is guilty of it"].)

## DISPOSITION

Let a peremptory writ of mandate issue directing the superior court to: (1) vacate its order granting defendants' motion and dismissing count 14 (violation of § 2052, subd. (a)) of the amended information filed on July 6, 2012; and (2) enter a new and different order denying defendants' Penal Code section 995 motions to set aside count 14 and reinstating count 14, a violation of section 2052, subdivision (a).

**CERTIFIED FOR PUBLICATION**

WILLHITE, Acting P. J.

We concur:

MANELLA, J.

SUZUKAWA, J.

9